IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THEOPHLIS ERVIN, #142696, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-468-WHA |
| | ) | (WO) |
| | ) | |
| LEEPOSEY DANIELS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION AND PROCEDURAL HISTORY

This 42 U.S.C. § 1983 action is before the court on an amended complaint filed by Theophlis Ervin ("Ervin"), a state inmate, in which he challenges the adequacy of medical treatment provided to him at the Elmore Correctional Center ("Elmore") for chronic back pain resulting from a fall "[i]n 1983 while working at a construction site."  *Aff. in Support of Amended Compl. - Doc. No. 22-1* at 1.  Ervin names Leeposey Daniels, the warden of Elmore at the time the claims arose, Corizon Medical Services, the contract medical care provider for the state prison system, and Dr. Crocker, Nurse Hicks, Nurse Guice, Nurse Copeland and Nurse Tellis, health care personnel employed at Elmore during the relevant period of time, as defendants.[1]  Ervin seeks monetary damages and injunctive relief for the alleged violations of his constitutional rights.

---

[1]Ervin initially identifies Nurse Tellis as Nurse Tillis but thereafter does not dispute that this defendant's true last name is Tellis.  For purposes of this Recommendation, the court will utilize the correct name for this defendant.

The defendants filed a special report, supplemental special reports, relevant evidentiary materials in support of their reports, including affidavits and certified copies of medical records, and responses to discovery addressing the claims presented by Ervin.  In these filings, the defendants deny they acted with deliberate indifference to Ervin's medical needs.

The court entered orders allowing Ervin to file responses to the reports and evidentiary materials submitted by the defendants.  *Doc. No. 35; Doc. No. 87; Doc. No. 138*.  In the initial order, the Court advised Ervin that unless "**sufficient legal cause**" is shown within fifteen days of entry of this order "**why such action should not be undertaken**, the court may at any time [after expiration of the time allowed for filing responses] and **without further notice to the parties** (1) treat the special report[s] and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law."  *Doc. No. 35* at 2-3.  Pursuant to this order, the court deems it appropriate to cumulatively treat the defendants' reports as a motion for summary judgment.

Upon consideration of the defendants' motion for summary judgment, the evidentiary materials filed in support thereof, the sworn complaint, the plaintiff's responses to the reports, and the discovery materials submitted by the defendants in response to the plaintiff's requests, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [now dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Williamson Oil Co., Inc. v. Phillip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003) (moving party bears the initial burden of establishing there is no genuine dispute as to any material fact); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (same).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by demonstrating that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id.*  "'Shall' is also restored to express the direction to grant summary judgment."  *Id.*  Despite these stylistic changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

ultimate burden of proof.  *Celotex*, 477 U.S. at 322-324; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (the moving party discharges his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial).

The defendants maintain that they have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff.  Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when the nonmoving party produces

evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities and [correctional medical personnel].  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).

To proceed beyond the summary judgment stage, an inmate-plaintiff is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e).  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . ., in the

absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record . . . [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists."  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Liberty Lobby*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Grp., Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing *Liberty Lobby*, *supra*).

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials,

7

and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact.  *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record, including the medical records compiled contemporaneously with treatment provided to Ervin for pain associated with his back injury.  After such review, the court finds that Ervin has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

### III.  ABSOLUTE IMMUNITY - WARDEN DANIELS

To the extent Ervin lodges claims against defendant Daniels in his official capacity, this defendant is entitled to absolute immunity from monetary damages.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).   "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

At all times relevant to the complaint, defendant Daniels was a state actor entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from him in his official capacity. *Lancaster*, 116 F.3d at 1429; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment); *Edwards v. Wallace Comm. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (damages are unavailable from state official sued in his official capacity).  Thus, the court will address the claims

presented against defendant Daniels only insofar as the plaintiff seeks relief from this defendant in his individual capacity.

## IV.  DISCUSSION[3]

### A.  Deliberation Indifference

The record establishes that the Health Care Unit on site at Staton Correctional Facility, which includes an infirmary, is used for treatment of inmates incarcerated at Elmore Correctional Center as these institutions are "immediately adjacent" to each other. *Defs.' Exh. B to the May 9, 2016 Response to Discovery - Doc. No. 140-2 at 6.* The Staton Health Care Unit is at all times staffed by a health care provider accessible to inmates at Elmore for both non-emergent and emergent medical care. *Id.* In addition, there are "dedicated spaces within Elmore Correctional Facility utilized by members of the medical staff" for pill call and/or sick call screening and "members of the nursing staff were routinely present within Elmore Correctional Facility." *Id.* Moreover, the medical director assigned to Staton "serves the inmate population at Elmore Correctional Facility[,]" *Defs.' Exh. A to the May 9, 2016 Response to Discovery - Doc. No. 140-1 at 4,* and "a licensed physician is on-call 24 hours per day, 7 days per week." *Defs.' Exh. B to the May 9, 2016 Response to Discovery - Doc. No. 140-2 at 6.* Ervin concedes that "[t]he medical facility at Staton has nurses/doctors there 24/7, medical equipment, such as X-rays, EKG, beds,

---

[3]The court limits its review to the allegations set forth in the complaint.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Florida Dep't of Corr.*, 502 F. App'x. 905, 909-910 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cty. Sch. Dist.*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (court refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

etc., every thing which is required in a hospital, [but] nothing of this sort is at Elmore Corr. Fac." *Plaintiff's Response - Doc. No. 100* at 2.

Ervin complains that a "full complement of" medical personnel are not stationed at Elmore "on a 24 hour, seven day a week basis, to make visual observation[s]" of inmates to determine the need for treatment. *Amended Compl. - Doc. No. 22* at 3.   Ervin maintains that lack of a full time medical staff assigned to Elmore caused delays in his receiving treatment for chronic lower back pain on various weekends as correctional officers made the decision regarding whether his condition constituted an emergency which warranted transport to the Staton Health Care Unit for treatment.   *Id*.   Ervin also alleges that defendants Tellis, Guice, and Hicks refused him access to medical treatment absent his execution of a co-payment form and, when he signed the form, denied him appropriate treatment for his back pain.   *Id*. at 6-7.   Ervin likewise challenges the assessment of a co-payment for sick call screenings that consisted only of assessment by a nurse.   *Id*. at 10-12.   Ervin next argues that Dr. Crocker acted with deliberate indifference to his back condition because he "refused to allow plaintiff to return for consultation with [the free-world] neurosurgeon 'Dr. Francavilla'. . . who [previously] performed two (2) surger[ies]" on his back.   *Id*. at 13.   In addition, Ervin asserts that Dr. Crocker failed to provide him appropriate treatment and medication to fully alleviate his pain.   *Id*.   Ervin further maintains that he advised Warden Daniels of the issues regarding the lack of adequate medical treatment and Daniels did not intervene to ensure receipt of necessary treatment for his back pain.   *Id*. at 3-4.   Finally, Ervin contends that Corizon is responsible for the actions of

11

its employees due to the adoption of policies governing medical treatment, its refusal to allow his referral to a free-world neurosurgeon solely due to financial concerns and its "conscious decision to not staff medical personnel at Elmore Correctional Center[.]" *Id.* at 16.

The defendants adamantly deny they acted with deliberate indifference to Ervin's medical needs.  In support of this assertion, the defendants maintain that Ervin had continuous access to medical treatment provided by health care personnel assigned to Staton, a facility adjacent to Elmore, for both routine matters and any emergency situation that may have arisen.  The defendants assert that medical personnel routinely evaluated Ervin regarding his complaints of back pain, assessed his need for treatment, provided treatment in accordance with their professional judgment, including prescription of various medications and provision of medical profiles to alleviate his pain, and referred Ervin to a free-world neurosurgeon when they deemed such action was warranted by his physical condition.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).  Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical

needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.").

> That medical malpractice - negligence by a physician - is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . ., Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-1307 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to establish "an

objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291; *Mandel*, 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim

of cruel and unusual punishment.  *See Waldrop*, 871 F.2d at 1033 (citing
*Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation

and internal quotations omitted) (To show deliberate indifference to a serious medical need,

a plaintiff must demonstrate that the defendants' response to the need was more than

"merely accidental inadequacy, negligence in diagnosis or treatment, or even medical

malpractice actionable under state law.").   Moreover, "as *Estelle* teaches, whether

government actors should have employed additional diagnostic techniques or forms of

treatment 'is a classic example of a matter for medical judgment' and therefore not an

appropriate basis for grounding liability under the Eighth Amendment."  *Adams*, 61 F.3d

at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion

as to how a condition should be treated does not give rise to a constitutional violation.");

*Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a

different mode of medical treatment does not amount to deliberate indifference violative

of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison

medical personnel do not violate the Eighth Amendment simply because their opinions

concerning medical treatment conflict with that of the inmate-patient).   Self-serving

statements by a plaintiff do not create a question of fact in the face of contradictory,

contemporaneously created medical records.  *See Bennett v. Parker*, 898 F.2d 1530 (11th

Cir. 1990); *Scott*, 550 U.S. at 380.

   The evidentiary materials filed by the defendants address each of the claims made

by Ervin alleging a lack of adequate medical treatment.   A thorough review of these

15

documents demonstrates that the affidavits submitted by the defendants are corroborated by the objective medical records compiled contemporaneously with the treatment provided to Ervin relative to the instant claims of deliberate indifference.

    1.  <u>The Correctional Defendant</u>.  Warden Daniels states that "[a]t no time [has he] ever been involved in any medical health care plan or treatment with regard to Mr. Ervin. All medical decisions related to medical care are made by Corizon employees." *Defs.' Exh. 3 to the Special Report - Doc. No. 33-1* at 1-2.  Daniels further avers that he undertakes no action regarding "sick call requests or medical grievances." *Id*. at 2.  Finally, Daniels advises that although correctional officers "are not licensed physicians or nurses" these individuals have "received . . . training to recognize an inmate in need of [immediate] medical attention and the process for obtaining medical attention for inmates experiencing a medical emergency." *Defs.' Exh. F to the May 9, 2016 Discovery Response - Doc. No. Doc. No. 140-6* at 3.

    Ervin has failed to establish deliberate indifference on the part of defendant Daniels. Specifically, Ervin has not demonstrated that Warden Daniels was aware of facts establishing "an objectively serious medical need" nor that Daniels disregarded any known serious risk to Ervin's health. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure

to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).

Insofar as Ervin seeks to hold Daniels liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that defendant Daniels exerted some authority over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of respondeat superior [or vicarious liability]. . . . *Robertson v. Sichel*, 127 U.S. 507, 515–516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ('A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties').  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (Forty-two U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949. Thus, liability for medical treatment provided to Caldwell could attach to the correctional defendants only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions ... and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Ervin, however, has presented no evidence indicating that Daniels personally participated in or had any involvement, direct or otherwise, with the medical treatment provided by health care personnel; rather, it is undisputed that Warden Daniels did not participate in the provision of treatment to Ervin. The evidentiary materials before the

court demonstrate that medical personnel made all decisions relative to the course of treatment provided to Ervin and that they provided treatment to him in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, defendant Daniels can be held liable for decisions of medical personnel only if his actions bear a causal relationship to the purported violation of Ervin's constitutional rights.  To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of defendant Daniels, Ervin must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so."  *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Ervin has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that defendant Daniels directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action.  In addition, Ervin has presented no evidence of obvious, flagrant, or rampant abuse of continuing duration in the face of which this defendant failed to take corrective action; instead, the undisputed medical records

indicate that Ervin had continuous access to medical personnel and routinely received treatment for his back pain.  Finally, the undisputed records demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendant.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Emp't Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).  Summary judgment is therefore due to be granted in favor of defendant Daniels.  Furthermore, even had Ervin presented a proper basis for the claims lodged against defendant Daniels, the medical records before the court indicate that health care personnel did not act with deliberate indifference to Ervin's medical needs.

2.  <u>The Medical Defendants</u>.  Michele Sagers-Copeland, a registered nurse who serves as the Health Services Administrator at Staton, acknowledges that inmates incarcerated at Elmore receive medical care from the medical staff at Staton due to the close proximity of these correctional facilities.  Ms. Sagers-Copeland addresses the claims presented against her as follows:

> Upon arriving at any facility operated by the ADOC, inmates are notified of the procedures and processes for obtaining medical care and prescribed medications.  The health care units within ADOC facilities generally rely upon the same procedures for obtaining emergency and non-emergency (<u>i.e.</u>, sick call) medical treatment, conducting chronic care clinics, medication administration, segregation sick call and the like and permitting an inmate's invocation of and participation in a grievance process.  As part of this medical staff's orientation of inmates, inmates are provided a form entitled "ACCESS TO HEALTHCARE SERVICES" which also provides a detailed explanation of the grievance process.
> * * *

. . . In responding to . . . Grievances [filed by Mr. Ervin], I relied upon the information set forth in Mr. Ervin's medical records and the information provided to me by the medical staff.  I did confirm that the Elmore medical staff had conducted multiple evaluations of Mr. Ervin and that he was receiving the medication requested; however, I did not personally conduct an evaluation or otherwise direct the medical staff to provide any specific type of medical treatment, which would have been beyond my authority.

An inmate making a sick call request is required to complete the top portion of the sick call request form (stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and his signature).  The inmate then submits the sick call request form by placing it in one of many of the locked boxes located throughout the facility. The sick call request forms are removed from the locked box[es] each day at approximately 12:00 p.m., brought to the Health Care Unit and marked as received [by medical personnel] at that time.

Upon reviewing the sick call request forms, the medical staff compiles a list of inmates that have submitted sick call request forms and provides the list to the Alabama Department of Corrections officer assigned to the Health Care Unit.  The Health Care Unit officer summons the patients by radio. [Inmates at Elmore on the sick call list are transported to the Health Care Unit at Staton for evaluation and treatment].  Sick call begins at 7:00 a.m. and ends at 9:00 a.m. . . .  The nurse conducting sick call takes inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner[.] . . .  If an inmate submits more than one (1) sick call request form on the same day, the nurse will only fill in the intake information on one (1) sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan.

A submitted sick call request form that is not completed by the medical staff indicates that the inmate failed to report when summoned to sick call and a refusal is signed.  The nurse will call for the inmate to sign a refusal.  If the inmate does not show, the nurse will sign the refusal and have another nurse [or officer] to witness [the refusal].  If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit for medical treatment, and the inmate will not be required to wait until sick call begins.

As set forth in the "ACCESS TO HEALTHCARE SERVICES" form, inmates receive prescribed medication through the process commonly referred to as "pill call."  During pill call, inmates line up outside of the pill call windows outside of the Health Care Unit [or the pill call room at Elmore].  When the inmate arrives at the pill call window, he provides a

member of the medical staff [conducting pill call] with his identification badge which is issued by the ADOC. The member of the medical staff then retrieves the inmate's medication which is organized alphabetically and punches the medication out of a medication blister pack into a small plastic cup. The medication is provided to the inmate who is required to immediately take the medication.

As the pill call process progresses, the medical staff conducting the pill call records the disbursement of medication on forms known as "Medication Administration Records" or MARs. These MARs are maintained and filed in the individual inmate['s] medical records. Once the medications are dispensed, the medical staff member records the dispensing of medication by placing his initial or initials in the space provided on the corresponding MAR. If an inmate does not report to pill call to retrieve his medication, the medical staff member will either (1) leave the form blank, or (2) place the letter "A" or "a" in the space provided, indicating the inmate was "absent." If the medical staff conducting pill call discovers an inmate's medication has run out, expired or cannot otherwise be dispensed to the inmate, the medical staff at Elmore is instructed to document the unavailability of the medication and notify their supervisor or the prescribing physician immediately.

* * *

In terms of my involvement in direct patient care as the Staton HSA, my most direct contact with specific inmates and specific issues related to an inmate's medical care involves responding to inmate grievances. . . . In responding to inmate grievances, I am exposed to certain specific circumstances related to inmate medical care and inmate complaints. However, excluding my involvement in the grievance process, I am rarely notified of an inmate's complaints or any specific issues related to an inmate's medical condition, which were usually managed by the site Medical Director who is responsible for the overall clinical management of the facility and/or other members of the medical staff who report to the Medical Director. I was not involved in the provision of any medical evaluations or treatment provided to Mr. Ervin, and I did not make any decisions of any kind regarding the extent or degree of medical treatment provided to him. Moreover, as a nurse, I am not authorized to refer any inmate, including Mr. Ervin, to any third party provider such [as] an orthopedic [or neurological] specialist. Decisions related to specialty medical consultations must originate from the site Medical Director, not a member of the nursing staff.

*Exh. 4 to the Defs.' Special Report - Doc. No. 33-4* at 2-7 (paragraph numbering omitted).

Demetric Hicks, a Certified Registered Nurse Practitioner, filed an affidavit and supplemental affidavit addressing the claims made by Ervin.  The relevant portion of her initial affidavit reads as follows:

> As part of my duties and responsibilities at Staton, I . . . oversee the medical services provided to the inmates incarcerated at Elmore Correctional Facility ("Elmore"), which is located . . . approximately a quarter of a mile from Staton.  Because of the close proximity of Elmore and Staton, the medical staff at Staton also oversees and ensures the delivery of medical care to the inmates at Elmore as well.
>
> Through my work at Staton, I am familiar with Mr. Theophlis Ervin ("Mr. Ervin"), an individual currently incarcerated at Elmore.  I understand from reviewing Mr. Ervin's Complaint that he generally complains about the level of medical treatment provided to him by members of the nursing staff at Staton, including me, with respect to his complaints of back pain. Mr. Ervin does not mention any specific occasion when he claims I allegedly denied him medical attention; however, in my interactions with Mr. Ervin, I did not ignore or dismiss his complaints. I cannot recall any instance when Mr. Ervin raised concerns or complaints to me regarding his medical condition when Mr. Ervin did not receive any medical attention of any kind. Mr. Ervin never complained to me of any medical conditions which required emergency or immediate medical treatment, which were not addressed by the members of the medical staff at Staton.  He never complained to me about the medications which were prescribed for him or that he needed any medication which had not been prescribed for him.
>
> More specifically, my interactions with Mr. Ervin were limited to those occasions when I conducted chronic care clinics at Staton.   Inmates with chronic medical conditions at Staton are also eligible to attend regularly scheduled evaluations called "chronic care clinics." Chronic care clinics are held on approximately a quarterly basis for inmates diagnosed with a chronic medical condition such as hypertension, diabetes, hepatitis C, and chronic obstructive pulmonary disease. Inmates are not charged any type of co-pay in order to attend a chronic care clinic.  These chronic care clinics are particularly important for inmates prescribed with certain types of medications or treatments that require regular monitoring, such as diabetics receiving insulin on a sliding scale. The medical staff at Staton enrolled Mr. Ervin in chronic care clinics in order to monitor his hyperlipidemia, i.e. elevated cholesterol.  Therefore, my interactions with Mr. Ervin were focused upon his chronic hyperlipidemia, not any other medical conditions for which he was required to submit a sick call request form.  For example,

during a chronic care clinic held on July 2, 2013, Mr. Ervin mentioned to me that he had experienced some back pain, but also indicated that he had a pending appointment with another member of the nursing staff for renewal of his pain medications related to his back.  I recorded this interaction in the chronic care documentation from this interaction.  However, it was evident to me from my interactions with Mr. Ervin that he was interacting with other members of the Staton medical staff regarding his complaints of back pain and, therefore, Mr. Ervin did not request that I ever conduct any type of evaluation of his back and/or provide him with any level of medical treatment related to his back.  As such, I am completely unaware of the nature of his complaints, his medical history and/or the specific treatments provided to him during his incarceration at Elmore.

*Exh. 1 to the Defs.' Special Report - Doc. No. 33-1* at 1-3 (paragraph numbering omitted).

In her supplemental affidavit, Nurse Hicks states as follows:

I understand that Mr. Ervin alleged that during sick call screenings I "refused to provide medical treatment to him unless he signed the co-payment form and denied him treatment if he refused to sign the form," although he did not provide any specific dates or periods of time when I allegedly refused to provide medical treatment to him. This allegation is absolutely false.

When I worked as a nurse practitioner on Staton's medical staff [until February of 2014], I did not conduct sick call screenings.

My interactions with Mr. Ervin were limited to appointments for the chronic care clinics at Staton. As a matter of policy and practice, inmates were not charged a co-payment for any chronic care clinic visits when I worked at Staton, and, to my knowledge, this is still the case.

I never refused, either as part of a sick call screening or at any other time, to provide Mr. Ervin with any form of necessary medical care or treatment.  More specifically, I never refused Mr. Ervin any treatment. of any kind due to his failure to sign a "co-payment form." I am unable to even identify the document Mr. Ervin references as a "co-payment form." While I worked at Staton, Corizon did not maintain any such form, though the Alabama Department of Corrections ("ADOC'") did maintain a policy regarding inmate medical co-payments.  When I was on Staton's medical staff, I never refused to evaluate or treat any inmate based upon his refusal to sign any type of form related to co-payment fees. In fact, I was never notified when an inmate did not possess sufficient funds in his personal prison account to satisfy the co-payment.  I was always instructed and always abided by the instruction that inmates shall receive necessary and appropriate


medical treatment regardless of their ability to satisfy the co-payment fee. I never threatened, either as part of a sick call screening or at any other time, to withhold medical care or treatment from Mr. Ervin unless he signed an acknowledgement of the ADOC's policy on co-payments.

I am unaware of any member of Staton's medical staff who refused to provide medical care or treatment to Mr. Ervin until he signed an acknowledgment of the co-payment form or denied him medical care or treatment because he refused to sign the form.

Based upon my review of Mr. Ervin's circumstances, I am confident that he received an appropriate level of treatment. Furthermore, I cannot see any reason to conclude that the course of treatment Mr. Ervin received was inappropriate in any way or that the conduct of the medical staff at Staton fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, Staton's medical staff acted appropriately in all respects [in provided treatment to Mr. Ervin. . . .

*Exh. A to the Defs.' Supplemental Special Report - Doc. No. 139-1* at 1-4 (paragraph numbering omitted).

Domineek Guice, a Certified Registered Nurse Practitioner, submitted affidavits addressing the claims lodged against her by Ervin. Nurse Guice provides the following information in her January 24, 2014, affidavit:

As a certified registered nurse practitioner in the State of Alabama, I am qualified and licensed to do each of the following:

(a) Evaluate current health status and risk factors of individuals based on comprehensive health history and comprehensive physical examinations and assessments.

(b) Formulate a working diagnosis, develop and implement a treatment plan, evaluate and modify therapeutic regimens to promote positive patient outcomes.

(c) Prescribe, administer and provide therapeutic measures, tests, procedures, and drugs.

(d) Counsel, teach and assist individuals and families to assume responsibilities for self-care and prevention of illness, health maintenance and health restoration.

(e) Consult with and refer to other healthcare providers as appropriate.

Throughout my career, I have routinely conducted medical evaluations of and provided medical treatment to individuals with persistent lower back pain.

Through my work at Staton, I am familiar with Mr. Theophlis Ervin ("Mr. Ervin"). . . .  I understand from reviewing Mr. Ervin's Complaint that he complains about the level of medical treatment provided to him by various individuals, including me, regarding his complaints of lower back pain.  I also understand that a true and correct copy of certain records related to Mr. Ervin are being submitted as an attachment to the affidavit of Michelle Sagers-Copeland [and these records are referenced herein].  I reviewed Mr. Ervin's medical jacket to familiarize myself with his past medical care.

According to Mr. Ervin, he had previously injured his back on a construction job and developed continuing "disc" problems after two different surgeries, one of which resulted in a "steel rod" being placed along his spinal column.

As it relates to Mr. Ervin's allegations regarding me, Mr. Ervin does not mention any specific occasion when he claims l denied him medical attention; however, in my interactions with Mr. Ervin, I did not ignore or dismiss his complaints.  I cannot recall any instance when Mr. Ervin raised concerns or complaints to me regarding his medical condition when Mr. Ervin did not receive any medical attention of any kind.  Mr. Ervin never complained to me of any medical conditions which required emergency or immediate medical treatment, which were not addressed by the members of the medical staff at Staton.

During the two years prior to the filing of this action, the first mention of back pain [by Mr. Ervin] was in a sick call request form dated March 31, 2012.  However, when Mr. Ervin was summoned to the Health Care Unit at 8:00 a.m. on April 2, 2012, for evaluation he failed to appear.  The medical staff next scheduled an evaluation of Mr. Ervin on April 11, 2012, regarding his complaints of back pain.  When the medical staff summoned Mr. Ervin to the Health Care Unit for his sick call appointment, he only complained about the need for the renewal of profiles, i.e. physician's orders limiting his physical activities or granting him special privileges due to his existing medical condition.

Mr. Ervin next submitted a sick call request form dated April 4, 2012, related to his complaints about back pain and the need for additional profiles related to an egg crate mattress and a bottom bunk, but once again he failed to appear for sick call when summoned by the medical staff.  Three days later, Mr. Ervin again complained of back pain, but again failed to appear when summoned for sick call on April 9, 2012.

When Mr. Ervin submitted a sick call request form dated April 10, 2012, regarding his back pain, the medical staff actually evaluated him

26

during the next sick call clinic on April 11, 2012, at which time Mr. Ervin requested a back brace, a bottom bunk profile and an egg crate mattress. Mr. Ervin received his back brace and bottom bunk profile on April 17, 2012. Mr. Ervin next submitted a sick call request form related to his back pain in May of 2012 and was evaluated during sick call; thereafter, he did not submit another sick call request form until August of 2012 after which he failed to appear for evaluation during sick call. During the remainder of 2012, Mr. Ervin continued to submit sick call request forms requesting renewals of his profiles as well as renewal of his medications, though the nature of his back pain did not change or indicate any decline. During one December of 2012 appointment, Mr. Ervin specifically noted that a recent steroid shot had decreased his overall discomfort in his back.

Mr. Ervin's back condition throughout the 2012 calendar year exhibited all of the traditional signs and symptoms of chronic back pain. This condition is often brought about by trauma or injury, but can also result from aging. Most cases of chronic back pain are treated with conservative management. More aggressive and invasive treatments are typically only considered when a patient demonstrates a significant reduction in muscular or neurological function, which Mr. Ervin did not demonstrate at any time.

Throughout the beginning of 2013, the Staton medical staff continued to monitor Mr. Ervin's back condition, renew his medications and ensure that his condition did not show any signs or indications of decline. In a sick call request form dated January 7, 2013, Mr. Ervin requested a renewal of his medications but did not complain of back pain. When summoned to the Health Care Unit for evaluation of his request for medications, Mr. Ervin again failed to appear. Multiple requests for renewal of medications continued between January and May of 2013.

As part of the monitoring of Mr. Ervin's condition, the medical staff ordered an x-ray of Mr. Ervin's back in May of 2013. Mr. Ervin underwent an x-ray of his lower back on May 20, 2013 which confirmed a prior back fusion surgery at his L4-5 vertebrae and also indicated some "mild degenerative osteophytic spurring" and some minor disc disease. Ultimately, the radiologist reading the x-ray results could only confirm the existence of "mild osteoarthritis" of Mr. Ervin's lower spine. In substance, this x-ray merely confirmed the prior diagnosis and reconfirmed the pain management regimen prescribed for Mr. Ervin at the time.

When the medical staff saw Mr. Ervin in June of 2013, he continued to complain of back pain, but the nature and extent of his complaints did not change and they continued to provide him with pain medication for his discomfort. After this June 2013 evaluation, Mr. Ervin did not submit another sick call request form complaining of back pain until August 20,

2013, at which time he was provided with renewed pain medication and scheduled an appointment with a provider.

As of July 2, 2013, Mr. Ervin, despite his continuing complaints of pain, did not indicate any deficits of any kind, demonstrating his ability to walk without any difficulty, as well as the absence of any muscle weakness or deficit in any way. Following this evaluation on July 2, 2013, Mr. Ervin was referred to the physician for further evaluation but also received various oral pain medications.

Mr. Ervin submitted a sick call request form on August 30, 2013, complaining of back pain, but failed to appear for sick call when summoned to the Health Care Unit. Mr. Ervin did not request another evaluation of his complaints of back pain until September 24, 2013, at which time he did not demonstrate any change in his overall condition.

As indicated through Mr. Ervin's various sick call requests, the orders received from the medical staff and the medication administration records, no member of the Staton medical staff ignored Mr. Ervin's complaints. These records demonstrate a long history of medications prescribed as part of a pain management regimen intended to reduce his symptoms. Despite his complaints of back pain and requests for various treatments, Mr. Ervin occasionally failed to appear at pill call to receive the medications prescribed for his back pain. For example, in May of 2012, the medical staff attempted to provide Mr. Ervin with a narcotic-like pain reliever by the name of Ultram; however, Mr. Ervin failed to appear to receive his Ultram on at least six (6) separate occasions during May of 2012. Likewise, in June of 2012, the medical staff provided Mr. Ervin with a prescription for the medication Parafon Forte to take as needed - this is a muscle relaxer to treat spasms and muscular discomfort related to his continued complaints of back pain. Ervin only appeared at pill call on a number of occasions when he was scheduled to receive medication. In short, Mr. Ervin did not comply with the treatment regimen prescribed for him.

As of today, Mr. Ervin still has an active prescription for Aspirin and Naproxen as necessary to alleviate his symptoms of arthritis [as osteoarthritis was indicated in the May of 2013 x-ray].

Having reviewed Mr. Ervin's medical records, I . . . located three occasions when Dr. Crocker evaluated Mr. Ervin [for complaints of pain associated with his back injury], which occurred on April 25, 2013, July 12, 2013 and October 28, 2013. The primary purpose of Dr. Crocker's evaluations involved a follow-up review of Mr. Ervin to evaluate his current pain regimen. Based on my review of the doctor's notes on July 12, 2013, Mr. Ervin was more concerned about his Colace and Prilosec prescriptions than complaints of his back. This visit was terminated before Dr. Crocker concluded the evaluation. Despite the termination of the visit, Dr. Crocker

entered orders, renewing Mr. Ervin's medication orders including his prescription for pain medication and a muscle relaxer (Robaxin). On the other two occasions (April 25, 2013 and October 28, 2013), Dr. Crocker prescribed pain medications to Mr. Ervin based upon his evaluation of Mr. Ervin and his then-existing medical condition. Pursuant to my review of Mr. Ervin's medical jacket, [as of January 24, 2014] these were the only three times Dr. Crocker evaluated Mr. Ervin.

Based upon my experience in treating patients like Mr. Ervin, the medical attention and treatment provided to Mr. Ervin during his incarceration at Elmore was appropriate and well within the standard of care for a certified registered nurse practitioner operating within a correctional environment. I did not engage in any activity or fail to take any necessary actions which resulted in or contributed to any harm or injury allegedly incurred by Mr. Ervin.

*Exh. 2 to the Defs.' Special Report - Doc. No. 33-2* at 1-7 (paragraph numbering and citations to medical records omitted).

With respect to Ervin's allegation that she refused him medical treatment unless he signed the co-payment form, Nurse Guice avers that "Mr. Ervin's allegation is absolutely false." *Exh. B to the Defs.' Supplemental Special Report - Doc. No. 139-2* at 1. In support of this assertion, Nurse Guice states as follows:

As a nurse practitioner, I do not conduct sick call screenings at Staton. I never evaluated Mr. Ervin as part of a sick call screening.

I have never dealt with the issue of inmate co-payment fees because this is handled administratively. I cannot identify the document Mr. Ervin references as a "co-payment form." Corizon does not maintain any such form, although the Alabama Department of Corrections ("ADOC") does maintain a policy regarding inmate medical co-payments. I have never refused to treat or evaluate any inmate based on that inmate's refusal to sign any type of form related to co-payment fees. Actually, I have never been notified if an inmate lacks sufficient funds in his personal prison account to pay the co-payment fee. I have been instructed, and it has always been my practice to follow this instruction, that inmates shall receive necessary and appropriate medical care and treatment regardless of their ability to satisfy the co-payment fee.

Contrary to Mr. Ervin's allegations, I have never refused, either as part of a sick call screening or at any other time, to provide him with any form of necessary medical care or treatment. More specifically, I never refused Mr. Ervin any treatment of any kind due to his failure to sign a "co-payment form" or any other type of form relating to co-payment fees. At no time, either as part of a sick call screening or otherwise, have I threatened to withhold medical treatment or care from Mr. Ervin unless he signed an acknowledgement of the ADOC's policy on co-payments.

*Id.* at 4-5 (paragraph numbering omitted).

Nurse Tellis provides the following response to Ervin's claims:

I understand that Mr. Ervin alleged that during sick call screenings I "refused to provide medical treatment to him unless he signed the co-payment form and denied him treatment if he refused to sign the form."

Mr. Ervin's allegation is absolutely false. I never refused, either as part of a sick call screening or at any other time, to provide Mr. Ervin with any form of necessary medical evaluation or treatment. Moreover, I never refused him any medical treatment of any kind due to his failure to sign a "co-payment form." In fact, I cannot even identify the document Mr. Ervin references as a "co-payment form." Corizon does not maintain any such form, though the Alabama Department of Corrections ("ADOC") does maintain a policy regarding inmate medical co-payments. Again, I have never refused to evaluate or treat any inmate based upon his refusal to sign any type of form related to co-payment fees. In fact, I have never been notified when an inmate does not possess sufficient funds in his personal prison account to satisfy the co-payment. I have always been instructed and have abided by the instruction that inmates shall receive necessary and appropriate medical treatment regardless of their ability to satisfy the co-payment fee. I never threatened, either as part of a sick call screening or at any other time, to withhold medical care or treatment from Mr. Ervin unless he signed an acknowledgement of the ADOC's policy on co-payments.

To be clear, the ADOC, not Corizon, collects and receives the inmate medical co-payment fees. No portion of these fees goes to Corizon.

During the two-year period preceding July 3, 2013, I examined Mr. Ervin on several occasions at Staton, but I saw him during a sick call screening on only two occasions: March 13, 2013, and June 13, 2013. On both occasions, I provided him appropriate care and treatment for his medical condition. I do not know whether Mr. Ervin signed or refused to sign any types of forms in conjunction with these sick call evaluations.

On March 13, 2013, Mr. Ervin utilized the sick call process to complain of low back discomfort, discomfort in his legs and acid reflux and to request renewed medication prescriptions.  I checked Mr. Ervin's vital signs, examined the areas of his body with the alleged discomfort, assessed his symptoms, provided him with medications for his conditions, educated him on ways to alleviate any discomfort and otherwise treated his medical conditions.  As indicated in my notes from this March 13, 2013, sick call evaluation, I did not refuse to provide Mr. Ervin medical care or treatment or deny him medical care or treatment but, much to the contrary, provided the medical care and treatment appropriate to his condition.

On June 13, 2013, Mr. Ervin attended sick call voicing concerns about discomfort in his lower back and both legs. I again evaluated Mr. Ervin, checked his vital signs, assessed his symptoms, provided him with Ibuprofen for discomfort and referred his chart to the medical provider for further review.  Thus, on June 3, 2013, I did not refuse to provide medical care or treatment to Mr. Ervin or deny him medical care or treatment for any reason, and certainly not because he refused to sign an acknowledgement of the ADOC's policy on medical co-payments.

I understand that Mr. Ervin alleges that on May 8, 2013, I threatened to withhold medical care and treatment [to him] unless he signed the "co-payment form."  However, I did not see Mr. Ervin during a sick call screening on May 8, 2013, nor was I even aware of any sick call request he submitted during this timeframe.  In short, I had no involvement in any medical treatment sought or received by Mr. Ervin on or around May 8, 2013.

I am not aware of any member of Staton's medical staff who refused to provide medical care or treatment to Mr. Ervin until he signed an acknowledgment of the co-payment policy or denied him medical care or treatment because he refused to sign the form.

Based upon my review of Mr. Ervin's circumstances, I am confident that he has received an appropriate level of treatment from the medical staff at Staton. . . .

*Exh. C to the Defs.' Supplemental Special Report - Doc. No. 139-3 at 3-5.*

Finally, Dr. Crocker addresses Ervin's allegations, in pertinent part, as follows:

Over the last year, I have seen a number of patients incarcerated at Elmore Correctional Facility ("Elmore"), Staton Correctional Facility ("Staton") and Frank Lee Work Release Facility ("FLWR") - all of which are located in close proximity and are serviced by a central medical unit at Staton.  While seeing patients at Staton, I saw Theophlis R. Ervin . . . on several occasions for complaints of back pain.

   In preparing this affidavit, I have reviewed the other affidavits offered in this matter and the Order recently entered by the Court regarding its request for additional information, which are addressed below. . . .

   Contrary to the allegations asserted by Mr. Ervin, he did not undergo an MRI on April 5, 2014, but a month earlier on March 5, 2014. The request for the MRI and the scheduling of the MRI for Mr. Ervin actually began in February of 2014. As discussed more below, the referral for an MRI does not indicate any delay or denial of medical care on the part of anyone on the medical staff at Staton, but was part of the continuing evaluation and treatment for his complaints of back pain.

   As indicated in the prior affidavits submitted to the Court, I saw Mr. Ervin on approximately three (3) occasions during 2013 with respect to his complaints of back pain. During the course of my evaluations of Mr. Ervin, I reviewed his historical complaints of back pain, the symptoms reported, the examinations and findings reported as well as the treatment prescribed by the clinicians at Staton. In my review of these records, I concluded that the medical staff, despite certain instances when Mr. Ervin was non-compliant with medication orders and uncooperative in his treatment, had provided an appropriate course of therapy and pain management based upon Mr. Ervin's complaints and the findings from the examinations and imaging studies. When I saw Mr. Ervin in April of 2013, I continued to prescribe pain medications for his complaints and provided him with an additional prescription for a muscle relaxer. I next saw Mr. Ervin in July of 2013 and, at that time, it appeared as though the addition of the muscle relaxer had proven effective in limiting Mr. Ervin's discomfort. However, before I could complete my examination, Mr. Ervin terminated the appointment. When I saw Mr. Ervin again in October, 2013, it appeared that his complaints of back pain continued. It is important to note that other members of the medical staff were seeing Mr. Ervin on a regular basis throughout 2013 and continuing into 2014 to follow his condition.

   In early 2014, Mr. Ervin's condition began showing some signs of decline in terms of his range of motion and discomfort upon movement. Dr. Hugh Hood approved a referral to an off-site diagnostic imaging facility for an MRI of his lower spine. On March 5, 2014, Mr. Ervin underwent an MRI at Jackson Hospital and the results of the MRI are attached to this affidavit. As indicated in the MRI results, the MRI revealed "spinal stenosis" and "forminal narrowing," particularly in his lower spine. Spinal stenosis is a narrowing of the spaces in the vertebral column which can result in increased pressure on the spinal cord. Spinal stenosis typically is a very unpredictable condition that can develop over long periods of time without any symptoms or can cause the rapid progression of symptoms. In some severe cases of spinal stenosis, patients experience severe symptoms such as problems with

bowel and/or bladder functioning; however, Mr. Ervin never reported any such symptoms throughout my evaluations of him and his symptoms appear to be moderate in comparison to most cases of spinal stenosis. Based upon my review of the MRI, it does not appear that the spinal stenosis was *caused* by the prior surgical procedure, though this prior procedure could have served to mask his symptoms given his complaints about the recovery from the prior back surgery. . . .

Upon receiving the results of the MRI, Mr. Ervin received an off-site referral to Dr. Blake E. Pearson at Brookwood Neurosurgery & Spine in Birmingham, Alabama, on the earliest possible date. Mr. Ervin attended an appointment with Dr. Pearson on April 24, 2014. As mentioned in Dr. Pearson's recommendations to me, he believes that Mr. Ervin constitutes a "good candidate" for surgery, yet [he] cannot guarantee that a surgical procedure will actually result in any improvement in Mr. Ervin's condition. On May 28, 2014, Mr. Ervin underwent the recommended surgical procedure (i.e. a lumbar laminectomy with fusion) with Dr. Blake Pearson at Brookwood Medical Center and was discharged from the hospital on June 1, 2014. He required re-admission after the surgical procedure between June 2, 2014, through June 4, 2014, because of his atrial flutter. We will continue to monitor his condition and ensure that he receives all of the necessary post-operative care.

Contrary to Mr. Ervin's allegations, the standard of care for an individual with a medical history similar to Mr. Ervin does not call for the immediate referral for an MRI. As indicated by the affidavits previously submitted in this case, the standard of care in Alabama for treatment of lower back pain involves a progressive plan of treatment involving pain medications and muscle relaxers over time with continuing evaluations of a patient's complaints and symptoms. In this case, Mr. Ervin's symptoms and treatment progressed in a fairly traditional fashion, resulting in progressive therapies followed by specialty referrals for evaluation and surgery. It remains to be seen if any surgical procedure can alleviate his pain and/or discomfort. Even after Mr. Ervin undergoes this procedure, it is unlikely that any surgical procedure will prevent further degenerative changes in his spine which will likely be a constant source of some level of discomfort for the remainder of his life, given his medical history and prior significant back injury.

While I understand that Mr. Ervin is dissatisfied with the level of medical care afforded him at Elmore, I can state to a degree of medical certainty that Mr. Ervin received a more than adequate degree of medical treatment during his incarceration at Elmore for his lower back pain. Moreover, I cannot find any reason for Mr. Ervin to claim that the medical

33

treatment afforded him has been anything less than complete, appropriate and acceptable in any respect.

*Defs.' Exh. 1 to the Supplemental Special Report - Doc. No. 81-1* at 1-5.

The details regarding the treatment provided to Ervin as set forth by the defendants in their affidavits is confirmed by the medical records filed in this case, *Defs.' Exh. A to the Special Report - Docs. No. 33-5, 33-6, 33-7 and 33-8*; *Defs.' Exh. A to the Supplemental Special Report - Doc. No. 81-1* at 7-18, and there is nothing before the court which undermines the credibility of these records. In addition, the medical records support the defendants' assertions that they did not threaten or refuse treatment to Ervin due to his failure to sign a co-payment form.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by medical personnel at Elmore in addressing Ervin's complaints of chronic back pain and other pain associated with his back injury did not violate his constitutional rights. The medical care Ervin received was adequate and certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. The allegations presented by Ervin simply fail to establish deliberate indifference. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545-1546 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability. In addition, the inmate's allegation that

his prison physician did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

The medical records indicate that Ervin received medical care for his complaints of pain emanating from his lower back and it is likewise evident that health care personnel rendered treatment to Ervin in accordance with their professional judgment.  Based on well settled law cited herein, Ervin's mere desire for a different mode of medical treatment does not constitute deliberate indifference.  In addition, Ervin has failed to present any evidence which indicates the medical defendants knew that the manner in which they provided treatment to him created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is therefore devoid of evidence, significantly probative or otherwise, showing that health care personnel acted with deliberate indifference to Ervin's medical condition.  Consequently, summary judgment is due to be granted in favor of defendants Crocker, Hicks, Guice, Tellis, Copeland, and Corizon Medical Services.

## B.  Assessment of Co-Payment

Ervin complains that his constitutional rights were violated by assessment of a co-payment for partial payment of costs attendant to medical evaluations performed by the

nursing staff provided upon his submission of sick call requests for treatment of his back pain.  *Amended Compl. - Doc. No. 22* at  10-12.[4]  In support of this assertion, Ervin argues that assessment of a co-payment for mere evaluation by a nurse is violative of his constitutional rights.  *Id.*

The charging of a co-payment for medical treatment provided to an inmate, standing alone, does not violate the Constitution.  The simple fact that Ervin is charged a nominal fee or co-payment for medical treatment regardless of the provider of such treatment does not in any way deprive him of a protected right, privilege or immunity.  *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (imposition of fee for medical treatment provided to an inmate does not amount to a constitutional violation); *Jones v. Corizon, et al.*, 2015 WL 5013954, at *17 (M.D.Ala. 2015), affirmed on appeal February 18, 2016, (charging of co-payment for treatment provided each time inmate seeks treatment through the sick call process not violative of the Constitution); *Bester v. Wilson*, 2000 WL 1367984, at *8 (S.D. Ala. August 18, 2000); ("[T]he charging of a fee to prisoners for medical treatment from their [available] funds has been held to be constitutional when challenged on several due process and Eighth Amendment grounds.").  The record is devoid of evidence indicating that Ervin was denied medical treatment due to his inability to pay the fee; instead, the evidentiary materials establish that Ervin received

---

[4]The Alabama Department of Corrections adopted the medical co-payment policy, initially set forth in Administrative Regulation No. 601, which is now contained in Administrative Regulation No. 703.  *See Defs.' Exh. 1 to the May 20, 2014 Response - Doc. No. 63-1* at 2-12.  The requisite medical co-payment is charged to the inmate and collected by correctional officials.  *Id.*  at 8.  However, "all inmates [must] have access to healthcare regardless of their ability to pay.  No inmate shall be denied care because of a record of non-payment or current inability to pay for health services."  *Id.* at 2.

medical treatment regardless of whether he had the ability to provide a co-payment. Since Ervin has failed to allege a violation of his constitutional rights with respect to the assessment/collection of fees associated with medical treatment, the defendants are entitled to summary judgment on this claim.

## V. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The defendants' motion for summary judgment be GRANTED.

2. Judgment be GRANTED in favor of the defendants.

3. This case be DISMISSED with prejudice.

4. The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before August 18, 2016 the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th

Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done this 4th day of August, 2016.


<u>      /s/  Wallace Capel, Jr.                    </u>
UNITED STATES MAGISTRATE JUDGE